PROGRESSIVE LIFE INSURANCE COMPANY *v.* DOOLEY.

4-7803                                                192 S. W. 2d 128

Opinion delivered January 21, 1946.

Rehearing denied February 18, 1946.

*E. M. Arnold*, for appellant.

*O. A. Featherston*, for appellee.

GRIFFIN SMITH, Chief Justice. Two policies of insurance—each for $500—were written on the life of James P. Dooley October 19, 1928. The Company denied liability because, as it contended, false answers were made to material questions when the applications were written, and these answers, under terms of the policy, were declared to be warranties. Premiums paid during the period involved amounted to $258.56. This sum was tendered and refused.

The Company issues non-medical policies: that is, it requires soliciting agents to ask the questions printed on the application form, and relies upon truthfulness of such statements and other information contained in the application in exercising the discretion to accept or reject the risk. In the case at bar D. J. Pate represented the Company. He had at one time lived in the town of Glenwood, where the Dooleys also resided.

Each policy was payable to Josie Dooley, the insured's sister, who testified regarding circumstances attending issuance and her brother's health. The assured died while an inmate of the State Hospital.

While it is admitted that for some time prior to his death James suffered from epileptic attacks and other nervous disorders, appellee seeks affirmance on the ground that the record discloses substantial testimony establishing sound health when the contracts were made. That would be true if excerpts could be taken from the evidence and considered alone: that is, if these statements could be accepted at full value, irrespective of preceding or succeeding sentences. For instance, one sister testified that in respect of health James "was just nervous, that is all I know; it didn't interfere with his general

health." Another sister testified that when the applications were made "James was in perfect health"; and a brother-in-law expressed this belief.

But the uncontradicted testimony is that James was afflicted most of his life, if not from birth. Dr. N. T. Hollis, clinical director for State Hospital, gave to the court essential facts from official records. The patient was admitted May 2, 1943, suffering from "psychosis with mental deficiency plus epileptic deterioration. . . . The boy had apparently been deficient all his life and has suffered with convulsive seizures upon the basic deficiency. . . . In addition to my personal observations and examination I base my findings upon an opinion formed from talking to the patient and his relatives. . . . His sister, Mrs. Roy Watkins, filled in our so-called 'anamnesis,' in which she stated that he was around a year in teething, three years in walking, and three years in talking, and that at the age of thirty-three he began having convulsive seizures; that he began going to school at the age of twelve."

Importance attaches to the testimony of Dr. W. B. Gould, local physician, who had known James for more than twenty years. Question: "During that time, what was his physical condition?" Answer: "Not good! He was of a nervous type. Very seldom was I called to see him—just a few times; still, I knew his condition was not good." Q. "Were his right hand and arm drawn and useless?" A. "He had some trouble with it. He had a peculiar twitching or turning of his hand. He was never engaged in any business that I knew of."

Appellee testified that while James did not talk "plain," his enunciation was such that the family could understand what was intended to be said. James had nervous spells, "but they didn't affect his mind." Question: "His hands were 'drawn' throughout his life?" A. "Yes, sir."

When asked whether the agent, Pate, "knew of James' affliction as well as you did," the witness replied, "he just lived in the same town."

There was testimony by another witness that although he (the witness) had resided in Glenwood for many years and had heard that such a person as James Dooley existed, he had never seen him.

Admitted facts are that the insured's mother desired that the policies be written, and she answered for her son when questions were asked. Appellee unequivocally stated that the agent asked all of the questions, that her mother gave the answers, and that the answers were written just as they were made. When asked whether Pate said anything regarding the certainty of procuring the insurance, appellee replied, "He said he would write it up and send it off and the Company would answer it. . . . [My mother] wanted a policy for him."

There is testimony by appellee that "[both my mother and Pate] knew the condition of the boy at the time"; yet, when asked whether Pate and Mrs. Dooley discussed the matter, appellee replied, "He didn't say much about the policy, [but] wrote it up and sent it off. In ten days it came in."

When answers (made by witnesses by whose testimony it was sought to show that James was an insurable risk when the policies were written) are weighed in their relation to other questions asked and answers given by the particular witness, the conclusion is inescapable that James was never normal, and that he was physically impaired when the insurance was written. Still, this would not defeat recovery if the agent, acting within the actual or apparent scope of his authority, knew of the conditions. Such knowledge would be imputed to the Company, resulting in a waiver, or estoppel, regardless of the fact that the answers, under express terms of the policies, are declared to be warranties and not mere representations.

It was said in *Southern National Life Insurance Company v. Heggie,* 206 Ark. 196, 174 S. W. 2d 831, that when an insurance company issues a policy with full knowledge of all the facts, such conduct is tantamount to

an assertion that the policy is valid at the time of delivery, and is a waiver of the known ground of invalidity. In the same case it was held that where the applicant's answers were incorrectly written on the application and fraud was later alleged, the insurance company would not be permitted to say that it relied on the answers as written when as a matter of fact its agent, acting within the scope of his authority, received other information. In the absence of collusion between applicant and agent, the latter's actual knowledge will be imputed to the company and substituted for the answers fraudulently written insofar as validity of the policy in that aspect is concerned.

The controlling question is disposed of when we determine whether there was substantial testimony showing that Pate knew of the insured's condition.

There is a suggestion—possibly nothing more—in the cross-examination of appellee that the so-called physical "condition" was discussed. Pate and Mrs. Dooley were seemingly uncertain whether policies would be written in response to the applications. Question: "Both of them knew the condition of the boy at the time?" A. "Yes, sir." Q. "And they discussed it?" A. "[Pate] didn't say much about the policy."

When asked whether James was present when the applications were written, one witness replied, "He saw him." Pate stated in the application that he did not see James, but approved the risk.

In circumstances such as we are dealing with an insurance company would ordinarily be put on inquiry when the application is signed by one other than the person it is proposed shall be insured; nor does it seem that premiums may be collected for sixteen years and no point of incontestibility be reached. On the other hand no one has a vested right in the fruits of false warranties. Testimony not met by substantial evidence is:

(a) James was nervous and irrational from birth. An arm was affected, he was slow in learning to talk and

walk, and his hearing was definitely impaired. At the age of twelve he was placed in the Arkansas School for the Deaf. He did not have "continuous" use of his arms. Prior to attending the State institution he had not gone to school, but thereafter he attended classes at Murfreesboro for four years, "and went some in Pike City"; and yet, at seventeen or eighteen years of age he had not "gone over" the fourth or fifth grades, in spite of the fact that his mother gave private lessons at home.

(b) Mrs. Roy Watkins (a sister), when asked if James was afflicted from birth, replied: "I don't know, but it was a crossup of nerves." This same witness testified that James' hands were not affected, "but they twitched."

(c) Pate *may* have seen James, but it does not affirmatively appear that he talked with him, or was with him long enough to acquire the basis for an opinion. There is nothing to show that Pate's act, in recommending the applicant, was predicated upon anything but answers given by Mrs. Dooley. Pate was later discharged, but not on account of the Dooley transaction.

(d) Dr. Gould, the family physician, would not testify that James was normal. There is no showing that after issuance of the policies the Company had information regarding the physical impairments complained of.

In *Progressive Life Insurance Company* v. *Preston,* 194 Ark. 84, 105 S. W. 2d 549, Mr. Justice BUTLER discussed the legal effect of warranties such as those involved in the instant appeal. It is not necessary to repeat the rule. One of the questions asked Mrs. Dooley was: "[Has James] any deformity or disability, such as spinal curvature, lameness, loss of limb, impairment of speech, loss of sight or hearing." The answer was "No." Appellee concedes that this question was asked and that her mother answered it on behalf of the applicant. Many other questions affecting the risk were propounded, but the issue so raised may be disposed of by merely calling attention to what Mr. Justice BUTLER said in the Preston case.

No question is raised regarding the amount tendered, representing premium refunds as such. Our view is that the plaintiff did not contradict by substantial proof the essential matters here discussed. It follows that a directed verdict should have been given for the defendant, with an order on the registrar to pay plaintiff the refunds.